## ELKHART PAPER COMPANY *v.* FULKERSON.

[No. 5,001. Filed October 6, 1905.]

1. JUDGMENT.—*Res Judicata.—Parties.—Issues.*—The decree in a suit commenced in 1887 to determine the rights and priorities of persons using waters from a reservoir is not *res judicata* in an action by a lessee of one of the parties thereto against another party to such suit, for damages for wrongfully depriving such lessee, in 1895 and 1896, of the water to which he was entitled. p. 225.

2. EVIDENCE.—*Damages.—Depriving Plaintiff of Water.—Decree Defining Rights.*—A prior decree defining the respective rights of the plaintiff and defendant to the use of water from a reservoir is admissible in an action for the defendant's deprivation of plaintiff of a proper share of such water. p. 225.

3. APPEAL AND ERROR.—*Weighing Evidence.*—The Appellate Court will not weigh conflicting evidence in a case triable by jury. p. 225.

4. DAMAGES. — *Negligence. — Joint Tort-Feasors. — Liability.* — Where several persons are entitled to take certain amounts of

water from a reservoir, and the wrongful and excessive use by some deprives plaintiff of his proper supply, he has a joint and several right of action for damages.   p. 226.

5.  DAMAGES.—*Excessive.*—Where defendant wrongfully deprived plaintiff of water to run his mill for 167 days and the rental value of the mill was from $25 to $30 per day, a judgment for $4,000 is not excessive.   p. 227.

6.  TRIAL.—*Instructions.—Damages.—Use of Water from Reservoir.*—Where plaintiff, a user in the first priority, of the water in a reservoir, sued defendant, a user in the fifth and sixth priorities, for damages for depriving plaintiff of his share of the water, an instruction that the users in the second, third and fourth priorities had the right to use their shares so long as they did not interfere with plaintiff's rights, is not erroneous. p. 228.

7.  SAME.—*Instructions.—Irrelevant.*—Giving an irrelevant instruction which misleads or confuses is reversible, but where it causes no injury it is harmless; and an instruction correctly stating the law, with some evidence to support it, is not reversible.   p. 229.

8.  SAME.—*Instructions.—Depriving Plaintiff of Water.—Plaintiff's Duty.*—An instruction, in an action for damages for defendant's depriving plaintiff of water to run his mill, stating that it was plaintiff's duty to use all of his water-wheels in an effort to get his part of the water, if they could be used to run the mill, but if he was wrongfully deprived of water by defendant he would not be bound to change or rearrange his mill to get his part of the water, is not erroneous, the evidence showing that his water-wheels were of the latest and most approved make and that he was entitled as of right to a certain amount of water which he was not getting.   p. 229.

From Elkhart Circuit Court; *Joseph D. Ferrall,* Judge.

Action by Fremont Fulkerson against the Elkhart Paper Company.   From a judgment for plaintiff, defendant appeals.   *Affirmed.*

*Van Fleet & Van Fleet,* for appellant.

*Anthony Deahl, B. F. Deahl* and *Arthur Darling,* for appellee.

MYERS, P. J.—At the time of the commencement of this action and for some time prior thereto appellee was the lessee, and Sage & Sage lessors of a flour-mill in the

city of Elkhart, propelled by water furnished by means of a canal or race from the St. Joseph river. Appellant owned a paper-mill run by water taken from the same canal, at a point above the mill of appellee. Appellee claimed that appellant took water which rightfully belonged to him, and by reason of the unlawful appropriation of the water by appellant he was compelled to close his mill during certain months of the years 1895 and 1896, to his damage in an amount equal to the reasonable rental value of such mill while so disabled by the cause stated. An answer of general denial to the complaint formed the issue. This issue was submitted to a jury, resulting in a verdict for appellee in the sum of $4,000. Judgment followed the verdict.

The only error assigned in this court is the overruling of appellant's motion for a new trial. While this motion contains many grounds for a new trial, our inquiry will be limited to the ones here discussed by it.

(1) The verdict of the jury is not sustained by sufficient evidence. The undisputed facts are: There were certain land and water rights and a water-power created by a dam across the St. Joseph river in the city of Elkhart, Indiana, owned by the Elkhart Hydraulic Company. This dam, at an ordinary stage of the river, furnished about 1,200 horse-power of water. The hydraulic company conveyed in fee certain portions of this land and water-power, giving to the first grantee a priority of right in the use of water, and to the second grantee a second priority, and so on in seven different grants, thus making seven priorities in the use of water, the company retaining the surplus. It took 1,118¾ horse-power of water to satisfy the seven grants, as found and fixed by the Elkhart Circuit Court in its decree in the case of the Elkhart Hydraulic Company v. Sage & Sage and others, entered November 9, 1896, and which is in full force and effect in substance as

follows: The first priority to Sage & Sage, 113¾ horse-power. The second priority to Kulp & Ummell, 37½ horse-power. The third priority to the St. Joseph Hydraulic Company, which includes the Home Electric Light & Power Company and all plants on the north side of the river, the right to one-third of all of the water in the St. Joseph river above the dam, subject to the first and second priorities, or, upon a basis of 1,118¾ horse-power, the use of water for 322½ horse-power. The fourth priority to the Muzzy Starch Company, 30 horse-power. The fifth priority to Charles G. Conn, 30 horse-power, Excelsior Starch Manufacturing Company, 45 horse-power; Muzzy Starch Company, 30 horse-power; Owens & Campbell, 115 horse-power; Elkhart Paper Company (appellant), 102½ horse-power; and the successors of one Hubler, 7½ horse-power —with equal priorities to all mentioned in this class. The sixth priority to the Excelsior Starch Manufacturing Company, 60 horse-power; the Elkhart Paper Company (appellant), 60 horse-power; Owens & Campbell, 45 horse-power; the Muzzy Starch Company, 30 horse-power; the Globe Tissue Paper Company, 60 horse-power—with equal priorities to all in this class. The seventh priority to the Elkhart Knitting Company, 30 horse-power.

By this same decree the court fixed the number of cubic feet of water per minute for each horse-power that each party was entitled to under a head of eight feet and upwards of water. The decree also provides that in no case shall the water be drawn down more than six inches below the effective crest of the dam, and if there is not sufficient water to furnish all the parties with water to which they are entitled under the decree, then the water is to be shut off in the inverse order of the priorities as in the decree fixed, until those having prior rights shall have the amount which they are entitled to receive.

The course of the St. Joseph river at the point in con-

troversy is from east to west. The water was taken from the river by means of one main race on the north side and one on the south side of the river, each race being furnished with water from a pond created by a dam across the river. Of the plants taking water for power from the main race on the south side of the river, the appellant's mill was nearest to the race intake, and appellee's mill the last one, or the one farthest away from the intake. The others were located between these two. There is evidence that all of these mills, for lack of water, were compelled to close down a part of the time covered by the complaint, except appellant's mill, which ran all the time, except when closed for repairs, as did also the Home Electric Light & Power Company.

The testimony of appellee was that "occasionally the paper mill shut down to make repairs, and we would have ten or eleven feet of water then. Well, when would anybody else stop? A. When anybody else stopped, it would not make so much difference, there was not so much of an increase in the quantity of water. Who was broke down so you could have ten or eleven feet of water? A. The Elkhart paper mill. Who else? A. Others would break down; but I say we could not notice them. Did you have more water then when others shut down? A. Well, not to make enough difference to amount to anything."

There is evidence that from January 15 to February 15, 1895, the water was from three to five feet below the crest of the dam, and that from the middle of May to the middle of November, 1895, and from August to October, 1896, both inclusive, appellee had water to run but a small portion of the time, during all of which time, except during the month of August, 1895, while the hydraulic company was making repairs and while there was no water in the race appellant was using from 250 to 400 horsepower of water, except in August, September and October,

1896, when it used water sufficient to produce 500 horse-power, and the water was from two to four feet below the crest of the dam. There is evidence tending to show that appellee's mill could have been operated to its full rating with water sufficient to produce 110 horse-power. There is evidence in the record tending to prove that the water used by appellant over and above the amount authorized in its grants was the cause of appellee's damage.

Appellant's grant, as found by the decree of the court heretofore referred to, gave it, all told, the use of water sufficient to produce 162½ horse-power, subject to certain priorities, and there is evidence that it used water sufficient to produce from 87½ to 337½ horse-power in excess of its authorized amount. The lease of appellee is of date July 6, 1894, operative from September 1, 1894, and contains the following stipulation: "Also all rights to water and water-power held by first party as lessees of the Elkhart Hydraulic Company for water and water-power for the purpose of propelling the machinery of said mill; it being agreed that said second party shall have, during the existence of this lease, the same right to use said water and water-power that said first party would have if this lease had not been made, and that such use of said water and water-power by said second party shall be subject to all the restrictions, limitations, conditions, liabilities and priorities that its use by said first party would be subject to if this lease were not made."

The case of the Elkhart Hydraulic Company against Sage & Sage and others was filed at the October term, 1887, of the Elkhart Circuit Court, and by this suit the plaintiffs therein sought to fix the priorities in the use of water as authorized by said several grants, and to have provided means by which the use of water by the parties authorized in said several grants could be regulated, and for injunctive relief against excessive use of water, and for

damages accrued to said plaintiff by reason of such excessive use of water. The pleadings and judgment in that case were introduced as a part of the evidence in the case at bar.

Appellant now contends that this evidence conclusively shows that the matters now being litigated were adjudicated in the Elkhart Hydraulic Company case, and that 1. it is entitled to the benefit of this defense. To the hydraulic company case appellee was not a party. The question here being one of appellee's damages, which was not in issue in that case, and, so far as we know from the record now before the court, he had no knowledge of that controversy, and therefore his rights to damages were not adjudicated. Under his lease from Sage & Sage he obtained their right to the use of the water taken from the St. Joseph river under their grant from the hydraulic company, and that right was fixed by the court in the hydraulic company case.

Under the issues in the case at bar, the pleadings and decree in that case were properly admitted in evidence for the purpose of establishing the rights of Sage & 2. Sage, but not for the purpose of proving former adjudication of the matters set up in this action, as no such issue is tendered. *Crum* v. *Rea* (1896), 14 Ind. App. 379; *Denney* v. *State, ex rel.* (1896), 144 Ind. 503, 537, 31 L. R. A. 726; *Louisville, etc., R. Co.* v. *Cauley* (1889), 119 Ind. 142; *Westfield Gas, etc., Co.* v. *Noblesville, etc., Gravel Road Co.* (1895), 13 Ind. App. 481, 55 Am. St. 244. Adhering to the decisions above cited, appellant's contention of *res adjudicata* is not well taken.

On the question of evidence to support the verdict, this court only takes cognizance when there is no evidence to support the same, as then it becomes a question of 3. law; otherwise it is a question of fact for the jury and the trial court to determine. *Cincinnati, etc., R. Co.* v. *Madden* (1893), 134 Ind. 462.

The following interrogatory was submitted to the jury: "No. 5. What percentage or proportion of the water of which plaintiff was wrongfully deprived, as alleged in his complaint, was taken by defendant? A. One hundred per cent." The appellant bitterly complains of this answer, and insists that the uncontradicted evidence shows that other parties were using water from the same source as appellant during the time covered by appellee in his complaint. If there is any evidence authorizing the answer, there can be no reasonable grounds upon which to argue the question of lack of evidence to support the verdict. If the amount of water used by appellant in excess of what it is authorized to use under its grants was the sole cause of appellee's damage, then the answer of the jury to the interrogatory was right, as a reasonable inference or conclusion drawn from the evidence. But, aside from the question as to whether there is evidence in the record authorizing such an answer, we are unable to agree with appellant's theory, granting that the proof does show the taking of some water by other mill users at different points along the race after it passed appellant and before reaching appellee, that each was liable only for the injury by each committed. It seems to us, from the uncontradicted facts and the evidence in this case, that all parties using water after it fell six inches below the effective crest of the dam were doing so in violation of appellee's rights, and while the water was taken from different points along the race, yet, as a matter of fact, it was being taken by all at the same time from the same general source of supply. There is evidence which tends to show that when the head water or the water in the pond was below a certain depth, to wit, eight feet, its use for the purpose there collected would be to a certain extent a waste. The irregular use of water by the parties, other than appellant and the Home Electric Light & Power Company, taking water from the general source of supply at the varying stages of the water during

the time for which appellee claims damages makes it very difficult, and it might be said impossible, to determine just what proportion of the water each used; and under such circumstances, although the acts of each may have been separate and independent, yet it can not be said that they together were not the direct cause of the single injury of which appellee complains, and, this being true, either is responsible for such injury. *Westfield Gas, etc., Co.* v. *Abernathy* (1893), 8 Ind. App. 73, 80; *City of Valparaiso* v. *Moffitt* (1895), 12 Ind. App. 250, 54 Am. St. 522; *Slater* v. *Mersereau* (1876), 64 N. Y. 138; *South Bend Mfg. Co.* v. *Liphart* (1895), 12 Ind. App. 185.

In the latter case this court said: "Intention, purpose, and concert of action is usually necessary to create joint liability between tort-feasors. But there is a class of cases in which, although the negligent acts are separate and distinct, they are concurrent in place and time and which result in producing a single injury. \* \* \* It would be impossible to apportion the damages between the two acts of negligence or determine the amount produced by each. The case is analogous to that of an injury produced by the collision of two railroad trains under different ownership and management, caused by the concurring negligence of both companies. Each company is jointly and severally liable for the whole injury." The law does not permit one person to shield himself from liability for an act resulting in injury by reason of the fact that some other person has at the same time contributed to producing the same injury; nor will the fact that plaintiff is prosecuting his suit against the one, instead of both, avail the defendant to defeat a recovery. *South Bend Mfg. Co.* v. *Liphart, supra.*

(2) Appellant contends that the damages assessed were excessive. There is evidence tending to show that the fair rental value of appellee's mill was from $25 to $30 per day, and the number of days lost by appellee 167. From this evidence it will be seen that the

jury had a basis upon which to assess the amount of damages stated in the verdict, and the finding is not erroneous.

(3)   Appellant contends that the fifth instruction given by the court on its own motion is erroneous.   The instruction reads as follows: "If you find from the evidence that the parties having the second, third and fourth priorities of right to said water used the water, but by their use of it did not use more than they had a right to, and did not interfere with plaintiff's rights, then they would have the right so to do."   It is in evidence that the appellant's use of water came within the fifth and sixth priorities as fixed by the court in its decree in the hydraulic company case, and that, in case of an insufficient supply for all the users, and to maintain the water in the pond within six inches of the crest of the dam, the users coming within the seventh, sixth, fifth and so on should cease using water in the inverse order of their priorities, until the main head of water could be maintained as aforesaid, and those supplied in the use of water in the order of their priorities in the amount as fixed by the court in its decree.   It also appears that appellee had the right of the first priority, and the second, third and fourth had a superior right to those in the fifth and sixth; and as appellant's right comes within the latter two priorities, and with the evidence tending to prove that it used from 250 to 500 horse-power at a time when the water was not maintained in the pond as it should have been, and that appellee had not sufficient water to run his mill, except when appellant closed down, and then the water would raise to a head of from ten to eleven feet, the jury might have reasonably drawn the inference from such evidence that there was sufficient water in the St. Joseph river to maintain the water at the required depth, and to furnish the users in the first four priorities during the time complained of the amount to which they were entitled without interfering with the rights of appellee.

With this view of the record, we can not say that the instruction is not pertinent to the evidence, or not along the lines of what the evidence tends to show.

We are well aware of that line of cases holding that, where the instruction is not applicable to the evidence and is liable to mislead and confuse the jury, it is error 7. and cause for reversal. *McMahon* v. *Flanders* (1878), 64 Ind. 334; *Moore* v. *State* (1879), 65 Ind. 382; *Summerlot* v. *Hamilton* (1889), 121 Ind. 87; *Reed* v. *State* (1895), 141 Ind. 116. There is also a series of cases holding that where it is apparent that the irrelevant instruction does not injure the complaining party, such error will not be sufficient cause to reverse the judgment. *Robinson* v. *State* (1899), 152 Ind. 304; *Reed* v. *State, supra.* It is also the law that an instruction which correctly states the law, with some evidence tending to support it, will not be considered reversible error. *McFadden* v. *Ferris* (1893), 6 Ind. App. 454; *State, ex rel.,* v. *Carey* (1899), 23 Ind. App. 378; *Harris* v. *State* (1900), 155 Ind. 265. The giving of this instruction was not reversible error.

(4) Appellant complains of the eighth instruction given by the court upon its own motion. This instruction reads as follows: "If you find from the evidence that at 8. a certain time, alleged in the complaint, the water at the plaintiff's mill became so low that he could not get 113¾ horse-power on four wheels which he was using, and that he had six wheels in his flume, I instruct you that it was his duty to make use of the two other said waterwheels in an effort to get his 113¾ horse-power, provided you find from the evidence that the mill was so constructed and the wheels so connected therewith that they could be used in operating the mill to manufacture flour; but if you find from the evidence that the plaintiff's amount of water was diminished by the wrongful act of the defendant, he would be under no obligation to change or rearrange his mill in order to get his full portion of water."

Appellant contends that by this instruction it was made responsible for the faulty construction of appellee's mill; "that appellee was only entitled to have a specified number of cubic inches of water per minute, varying inversely as his head varied; and that he was not entitled to water sufficient to run his particular wheels with such a power and speed as to manufacture flour." While we agree with appellant that it is quantity of water which fixes the horse-power, yet, in our opinion, the instruction is not subject to the criticism placed upon it. The instruction was given in the light of the evidence, which tends to show that appellee's mill throughout, including the water-wheels, was in the best of repair, and under a head of eight feet of water entitled him to 82.75 cubic feet of water per minute for each horse-power, and that his mill could have been run at full rating on a little less than the power to which he was thus entitled. In case of a greater head of water he was entitled to a less number of cubic feet per minute; but, in all events, the minimum head of eight feet was to be maintained before its use by others was authorized at all.

It appears from the evidence that in the flume of appellee's mill there are six water-wheels—two thirty-five-inch, one forty-inch and two forty-eight-inch—all known as standard wheels—and one forty-four-inch, known as a special wheel. Appellee's plant was a flour mill. The two forty-eight-inch and the one forty-four-inch water-wheels under an eight-foot head of water furnished power sufficient to run the mill for the manufacture of flour, when with less than an eight-foot head of water the forty-inch wheel was added. The other wheels were attached to and ran other parts of the mill, but, when necessary, on account of low water, these parts could be disconnected, and all of the water used on the four wheels, furnishing power to manufacture flour.

The uncontradicted evidence shows that during the time appellee's mill was closed down he had not to exceed four and one-half to five-foot head of water, and that he did some work under a six-foot head. The wheels used by appellee

were of the James Leffel & Company make. Tables of this make of wheels were introduced in evidence, showing, so far as applicable to this case, the following:

CAPACITY OF WHEELS

| Style and Size of Wheels | Head in Feet | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|
| Standard 35 | Power | 8½ | 11¼ | 14½ | 17½ | 20¼ |
| | Water | 1074 | 1185 | 1289 | 1382 | 1457 |
| | Speed | 88 | 96 | 104 | 111 | 118 |
| Standard 40 | Power | 11 | 15 | 19 | 23 | 27 |
| | Water | 1390 | 1580 | 1715 | 1817 | 1916 |
| | Speed | 77 | 84 | 91 | 97 | 103 |
| Standard 48 | Power | 16 | 21½ | 27 | 33 | 39 |
| | Water | 2022 | 2260 | 2437 | 2607 | 2738 |
| | Speed | 63 | 69 | 74 | 80 | 85 |
| Special 44 | Power | 19 | 25 | 32 | 39 | 46½ |
| | Water | 2401 | 2633 | 2869 | 3081 | 3265 |
| | Speed | 70 | 77 | 83 | 89 | 94 |

Power—Horse power.   Water—Cubic feet per minute.
Speed—Revolutions per minute.

From this table it will be seen that the three wheels in use under a head of eight feet of water will produce 105 horse-power by the use of 8,295 cubic feet of water per minute, when, according to appellant's admission, he was entitled to 9,402.80 cubic feet of water per minute. Under a head of six feet of water and the four wheels in use 83 horse-power could be produced, which was insufficient to run the mill. Under a five-foot head all of the wheels combined would give only 79 horse-power, but, inasmuch as appellee was to have a specified number of cubic feet of water per minute for each horse-power, appellant claims that under a five-foot head of water he was entitled to 15,018 cubic feet per minute, and at a four-foot head, 18,770 cubic feet per minute, and before he would be entitled to recover he must show that he could not get the number of cubic feet of water per minute awarded him by the decree in the hydraulic company case. As we have said, the minimum head of water was fixed at eight feet, and the maximum number of cubic feet of water to which appellee was entitled was fixed at 82.75 cubic feet per minute for each horse-

power; under a head of 8½ feet, 77.86 cubic feet per minute; and under a head of nine feet, 73.53 cubic feet per minute for each horse-power. It is apparent that appellee's mill was constructed with the view of being run by the power that an eight-foot head of water would furnish. That right was preserved to him by his lease from Sage & Sage, and they in turn were protected against all other users, including appellant, by the decree in the hydraulic company case. It does not lie with appellant to say that appellee might have reconstructed his mill, flume and water-wheels, and by the erection of additional water-wheels and upon some theory purely speculative a head of water might have been maintained at four feet, thereby giving him sufficient water to run his mill. It is not what appellee might have done. It is a question of what his rights are under the facts that appellant is legally bound to respect. Therefore the instruction in question, fairly construed, refers to the quantity of water obtainable by appellee, and is not objectionable.

(5) Appellant insists that the court erred in the admission and rejection of certain testimony. We have carefully examined the record relative to these grounds for a new trial, and, without extending this opinion to any greater length, we deem it sufficient to say that we find no error in the record upon this question authorizing us to reverse the judgment of the lower court. Therefore, in view of all the evidence and uncontested facts which appear from the record in this case, a correct conclusion was reached by the trial court, and the judgment should stand.

Judgment affirmed.